104 F.3d 354
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee-Cross-Appellant,
v.
Jose R. CABA, Defendant-Appellant-Cross-Appellee.
 No. 96-1069(L).
 United States Court of Appeals, Second Circuit.
 Nov. 29, 1996.
 
 E.D.N.Y.
 AFFIRMED.
 Appearing for Appellant: Lauren J. Resnick, Assistant United States Attorney, Eastern District of New York.
 Appearing for Appellee: Gail E. Laser, New York, N.Y.
 Present NEWMAN, Chief Judge, and OAKES and CALABRESI, Circuit Judges.
 ORDER
 UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Eastern District of New York (Trager, J.), it is hereby
 
 
 1
 ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED.
 
 
 2
 Defendant-Appellant-Cross-Appellee Jose Caba appeals and Appellee-Cross-Appellant United States of America cross-appeals from a judgment of conviction, entered on January 29, 1996, in the U.S. District Court for the Eastern District of New York (Trager, J.). Caba was convicted, following a jury trial, of one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(g); one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A) and 1956(a)(1)(B)(i); one count of conspiracy to violate the food stamp redemption regulations, in violation of 18 U.S.C. § 371; and five counts of violating the food stamp redemption regulations, in violation of 7 U.S.C. § 2024(b)(1). He was sentenced to a term of 30 months imprisonment, three years supervised release, a $6000 fine, $340,000 in restitution, and a $400 special assessment.
 
 
 3
 Caba's scheme involved converting food stamps to cash for truck drivers and wholesalers who accepted food stamps, but were not licensed to do so. Caba purchased the food stamps from truck drivers and wholesalers by check, deducting four to five percent from the face value of the food stamps as payment for the service. He then deposited the stamps in the bank account of Joselin Mejia, a grocery store owner licensed to accept food stamps. Because Mejia was licensed, the government would deposit cash into the account in exchange for the food stamps. In this way, according to the government, Caba laundered approximately $11,700,000 in proceeds from unauthorized food stamp transactions, making a personal profit of over $660,000 in the two and a half years of the scheme.
 
 1. Appeal
 
 4
 On appeal, Caba challenges his conviction for money laundering and conspiracy to launder money on the ground that his acts did not constitute the unlawful activity, as specified by the federal larceny statute, 18 U.S.C. § 641, underlying those counts. More specifically, Caba argues that he did not "without authority, sell[ ], convey or dispose[ ] of any record, voucher, money, or thing of value of the United States or of any department or agency thereof" in violation of the federal larceny statute, 18 U.S.C. § 641. He contends that to obtain a conviction under this statute the government must show that the defendant took United States property, and that the government did not prove any such taking at his trial.
 
 
 5
 The argument is without merit. Caba does not argue that the government failed to show that he committed the explicit elements of 18 U.S.C. § 641. Instead, he suggests that the legislative history of this statute and the cases in which it has been used demonstrate that there is an implicit takings requirement in the statute. In fact, neither the legislative history nor the case law supports his position.
 
 
 6
 Caba first contends that since § 641 codified larceny-type statutes, it applies only to larceny-type crimes and hence, that § 641 crimes must meet common law larceny requirements. The Supreme Court, however, has stated unambiguously that § 641 was intended to include crimes that would not have been common law larceny. See Morissette v. United States, 342 U.S. 246, 269 n. 28 (1952). The "without authority" clause, in particular, encompasses more than common law larceny. See United States v. Matzkin, 14 F.3d 1014, 1020 (4th Cir.1994), cert. denied, 116 S.Ct. 175 (1995). Thus, even if Caba accurately stated the requirements of common law larceny, there would be no basis for imputing a larceny requirement to the "without authority" clause of 18 U.S.C. § 641.
 
 
 7
 Caba similarly suggests that because cases involving the theft of government property in violation of § 641 often include takings-type language, there must be a takings requirement for conviction under the "without authority" clause, as well. This argument is misguided. It is no surprise that theft cases use takings language, because where there is a theft, there is necessarily a taking in the sense that the property is wrongfully seized. However, although many § 641 cases involve theft, theft is not a requirement for conviction under the § 641 "without authority" or conversion clauses. See Morissette, 342 U.S. at 271-72; United States v. Girard, 601 F.2d 69, 71 (2d Cir.), cert. denied, 444 U.S. 871 (1979). Accordingly, contrary to Caba's contentions, the takings language found in cases involving theft has no significance for convictions under the "without authority" clause when these involve property that was not wrongfully taken, but simply used without authority.
 
 
 8
 Finally, Caba argues that there have only been convictions in "without authority" cases when the government has suffered a loss. He claims that there was no proven financial loss to the government in his case--where loss is measured, as in the food stamp guideline, as the money diverted from intended food stamp recipients--and that therefore, he was not properly convicted pursuant to § 641. Even assuming, contrary to the district court's finding, that the government did not prove that any food stamps monies were diverted from their proper uses, this argument is unavailing.
 
 
 9
 The gravamen of the "without authority" clause offense is the unauthorized use of government property itself, not the monetary loss that may or may not be caused by such use. See United States v. Scott, 789 F.2d 795, 798 & n. 3 (9th Cir.1986). This is more than understandable, given the harm that can be done to governmental purposes even without financial loss. Caba's scheme, for example, did not necessarily cause any financial loss to the government--given that the government paid only the face value of the food stamps, and that the intended beneficiaries of the stamps may have received their full value in eligible food items from the retailers. Nevertheless, by creating a secondary market in food stamps that concealed, and thereby facilitated, the improper use of food stamps, Caba's scheme prevented the government from ensuring that the laws and regulations governing the food stamp program were enforceable and enforced. In recognition that § 641 was intended to prevent such harms, this court has, not surprisingly, upheld the application of § 641 in circumstances where the misappropriated government property at stake had no obvious financial worth to the government and where its misuse caused no evident financial loss to the government. See Girard, 601 F.2d at 71, aff'g, United States v. Lambert, 446 F.Supp. 890 (D.Conn.1978). We conclude that the government was not required to show a financial loss in order to convict Caba.
 
 
 10
 Accordingly, we affirm Caba's conviction.
 
 2. Cross-Appeal
 
 11
 At sentencing, the district court concluded that although Caba met the technical requirements of money laundering, Caba's activities were not the type targeted by the statute, and thus, were not within the "heartland" of the related sentencing guideline. The court reasoned (1) that the relatively severe base offense level provided in § 2S1.1 of the U.S.S.G. was established primarily in order to fight illegal drug trade, (2) that the guideline had been used almost exclusively in that context, and (3) that, even though non-drug crimes are covered by the guideline, Caba's crime was not the type of major money laundering fraud that would warrant a long jail sentence since the crime did not divert government monies from their intended purpose, but instead violated regulations designed to deter such diversion. Moreover, the court found that unlike traditional laundering schemes that conceal sullied monies, Caba was hardly trying to hide his activities. For these reasons, the district court relied on the sentencing guideline applicable to food stamp fraud, U.S.S.G. § 2F1.1, rather than the money laundering guideline, § 2S1.1, in determining Caba's sentence.
 
 
 12
 In its cross-appeal, the government argues that the district court erred in (1) concluding that the heartland of money laundering involves the drug trafficking proceeds and not the revenues from food stamp fraud; (2) finding that Caba did not attempt to conceal his activities, and (3) ignoring cases that applied the money laundering guidelines to food stamp fraud.
 
 
 13
 A sentencing court can depart from a guidelines range when it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). The Sentencing Commission explained in the introduction to the Sentencing Guidelines, that "each guideline [carves] out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a downward departure is warranted." U.S.S.G. Ch. 1, Part A, 4(b) (quoted in United States v. Skinner, 946 F.2d 176, 179 (2d Cir.1991)). We review for abuse of discretion a district court's decision to depart on the ground that a case does not fall within the "heartland" of a guideline. See United States v. Koon, 116 S.Ct. 2035, 2047 (1996).
 
 
 14
 The district court considered appropriate factors in determining whether Caba's activities fell within the heartland. Contrary to the government's somewhat exaggerated description of the district court's emphasis on drug trafficking as central to money laundering, the court legitimately reasoned (1) that the relatively severe base offense level established by § 2S1.1 of the U.S.S.G. was established primarily, but not exclusively, in order to fight the illegal drug trade, (2) that the guideline has been used almost entirely in the context of drug trafficking, and (3) that, in those cases in which non-drug crimes resulted in sentences under the money laundering guideline, unlike this case, serious money laundering fraud was involved. That is exactly the kind of analysis of typical cases encouraged by the Guidelines. See U.S.S.G. Ch. 1, Part A, 4(b); Koon, 116 S.Ct. at 2047.
 
 
 15
 This reasoning does not imply that the money laundering guideline could never apply to a food stamp fraud case. To the contrary, it suggests that a food stamp fraud may be within the "heartland" of the guideline when, for example, there is serious money laundering or unusually severe fraud involved. The court did not err in concluding that Caba did not present such a case since "the thrust of Caba's crime--and the Government's case against him--was not a 'ripoff' or diversion of the Government's monies from its intended purposes, but the violation of regulations designed to deter or reduce the opportunity for such diversion." United States v. Caba, 911 F.Supp. 630, 636 (E.D.N.Y.1996).
 
 
 16
 We therefore hold that the district court did not abuse its discretion in concluding that Caba's activities were outside the "heartland" of the money laundering guideline. We also find Caba's sentence of 30 months, three years supervised release, a $6000 fine, $340,000 in restitution, and a $400 special assessment to be reasonable given his crime. Because the district court acted within its discretion in analyzing the money laundering guideline to apply, at its core, to cases involving drug proceeds or very serious fraud, and in concluding that Caba's fraud was not of this nature, it is unnecessary for us to consider to what degree Caba attempted to conceal his activities.
 
 
 17
 We have examined all of the arguments made by Caba and by the government and find them to be without merit. The district court's judgment is affirmed.